THE GREAT FALLS MANUFACTURING COMPANY *v.* FERNALD & A.

The legislature have power, under the constitution, to authorize a corporation established for manufacturing purposes, to flow back water on land without the owner's consent, in order to create or improve the water power used in carrying on their works; on condition, however, that suitable provision is made for ascertaining and paying compensation to the land-owner.

THIS was a petition praying that the damages for flowing back water on land of the defendants by a dam of the petitioners, might be assessed under the provisions of an act passed July 8, 1862.

The petition sets forth the following general statement of facts:

On the 11th of June, 1823, the petitioners were incorporated with power to carry on the manufacture of cotton and woolen goods, and to construct and maintain such dams and canals as might be necessary for that purpose. Under the authority of their charter, they have for more than thirty years carried on a large business in that manufacture, and

have built, used, and maintained dams and other expensive works on Salmon Falls river.

In order to keep up a sufficient and constant supply of water, they have maintained and used for thirty years, and now do, a dam across that river at Milton Falls, which overflows and covers about fourteen hundred acres of land. They have acquired the perpetual right to flow this land, except about thirty acres, of lot 120, in the fourth division of lots in Milton, of less value than two hundred and fifty dollars, which is covered with water to the depth of about four feet. The thirty acres thus flowed are claimed by the defendants, Joseph Fernald and Sarah W. Worster, who are aggrieved and damaged by the maintenance of the dam.

More than thirty days before the filing of the petition, Fernald gave the petitioners notice of his grievance and damage, and the same has not been satisfactorily adjusted by the petitioners.

On the 8th of July, 1862, the legislature passed an act providing for the assessment of damages where any person is aggrieved or damaged by the exercise, on the part of the petitioners, of the rights, powers, and privileges in regard to dams and canals conferred by the original act of incorporation. The petitioners set out the act of 1862, which provides, "That if any person is aggrieved or damaged by the exercise on the part of said company of the rights, powers and privileges conferred by said act and used by said corporation, and said damage or grievance shall not be satisfactorily adjusted by said corporation within thirty days after due notice thereof, either party may apply by petition to the Supreme Judicial Court to have the damages, which have been done by said corporation assessed." The act provides for an examination by a committee, or, if either party elect, for an inquiry of damages by a jury, and that payment of the judgment for the damages assessed, "shall bar any further action in regard to said premises."

There was a general demurrer to the petition.

*E. A. Hibbard*, for the defendants.

The demurrer in this case was chiefly intended to raise the question whether the act of July 8, 1862, described in the petition, authorizes (or purports to authorize) the plaintiffs to flow land of others without their consent, or whether it simply provides a method for ascertaining the damages occasioned by the exercise of rights, powers and privileges conferred by the original act of incorporation. There can be no pretence that the plaintiffs, by virtue of their act of incorporation, have any more right to injure the land of the defendants than any private person, who might own the property of the corporation, would have possessed without any act of incorporation. The act of incorporation manifestly gives the plaintiffs no more right to cover land of individuals with water than to cover it with dams, mills, storehouses and other buildings, a right never claimed for this or any other similar corporation.

Strange as it may appear that the legislature should have passed a law which confers no benefits on the plaintiffs, it seems quite clear that the

law of 1862 is of that character. It does not grant, or profess to grant, any authority to the plaintiffs to flow land. The preamble falsely assumes that sufficient authority was granted by the original act, and the enacting part is expressly limited to the exercise of "rights, powers and privileges conferred by said act." The additional words, "and used by said corporation," cannot enlarge the meaning. To construe "and" as if it read "or" in that instance, would be a gross violation of the rules of language. One would think, judging from the curious phraseology of this act, that it must have been obtained merely for the purpose of aiding the plaintiffs in procuring settlements with land-owners; but it seems that the plaintiffs now claim that they have practised a successful imposition on the legislature, and under the pretence of providing for the assessment of damages for doing what they had a right to do before, have artfully for the first time obtained the right itself.

But the legislature had no constitutional power to pass either a general or special flowage act. It is not claimed that the legislature can authorize the taking of private property for *private* use. Now the plaintiffs are in no sense a *public* corporation, as a turnpike, ferry, railroad or aqueduct company may be regarded. Their business, like that of a bank or insurance company, may be beneficial to the vicinity where it is carried on; but the public have no rights in it; no citizen can compel them to employ him a day or sell him a yard of cloth; and they may continue business or stop it whenever it is for their interest, without regard to the interests of the community. The legislature has no authority over their business, in the regulation of the price of labor or goods or otherwise, any more than over that of an individual or partnership possessed of no corporate powers.

The reasoning of the Massachusetts courts, so far as they have sustained the taking (or injury) of property against the will of the owner for hydraulic purposes, might just as well (or even better) be applied to a hotel, company or bank, and allow them to select a building site at pleasure, under the pretence of accommodating the public. The spirit of such decisions would unquestionably require that manufacturing corporations should be entitled to take land of individuals for the erection of dams, factories, boarding-houses and the like, sufficient for their necessary purposes. This court can in no way better subserve the public interest than by giving a check to the destructive tendency of modern times to overlook "the chief end for which government is instituted," viz: "that every may may enjoy his own." The courts can protect the rights of property to the fullest extent without in the least degree crippling manufacturing enterprise.

If the act of incorporation had in plain terms granted to the plaintiffs authority to flow the defendants' land, perhaps the court would consider that a declaration by the legislature that the use contemplated was a public use, and would not undertake to reverse their decision. (The legislature, however, might suppose they had the power to grant such authority for a *private* use.) But in this case the court can see that this is not a public corporation, nor the use a public use, and that the legislature, in passing the act, could not have so regarded it.

*Wells & Eastman,* and *C. H. Bell,* for the petitioners.

The "act in relation to the Great Falls Manufacturing Co.," passed July 8, 1862, provides that, within certain limitations, the company shall have the right to flow lands with water, in the exercise of their corporate powers and privileges, upon the payment to the land-owners of such damages, as upon a proceeding instituted for the purpose, in case the parties are unable to agree upon the same, may be awarded by a committee appointed therefor by the court, or by a jury, if either party shall so elect.

It is not apprehended that any objection can be urged to the mode of fixing the compensation, but only to the grant of the right in lands of other parties, upon making any compensation.

The objection is understood to be founded upon the following clause of the twelfth article of the Bill of Rights in the constitution of New Hampshire : "But no part of a man's property shall be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people;" and upon the allegation that the act in question assumes to apply private property for uses which are not public.

We submit, then, that the act provides for the application of private property only for uses which are strictly public, according to the spirit and intent of the constitution.

What is meant by the term "public uses" as here employed ? The word *use,* as defined by the standard lexicographers, has two classes of significations, which might be applied to it in this connection ; the one primary and restricted, the other secondary and extended. We give them here, numbered 1 and 2, respectively :

JOHNSON.    1.    The act of employing anything to any purpose ; qualities that make a thing proper for any purpose ; need of ; occasion on which a thing can be employed.

2.    Advantage received ; power of receiving advantage ; convenience ; help ; usefulness.

WALKER.    Same definitions as Johnson, except that the word "usefulness" is not included.

WEBSTER.    1.    Employment ; application of anything to a purpose, good or bad.

2.    Usefulness ; utility ; advantage ; production of benefit.

These definitions do not differ substantially from each other ; and it would seem an equally authorized employment of the term, to give it the narrower meaning, that private property may be applied directly for the occupation of the public ; or the broader, that private property may be applied indirectly for the public advantage.

I.    We contend that the authors of the constitution did not intend to limit the expression to its narrower sense, but meant that it should be taken in its more extended signification.

1.    This is indicated by the employment of the plural—public *uses.* It implies a more general and comprehensive meaning than the singular of the noun would convey. It assumes that there may be a variety of

modes by which the appropriation of the property of individuals may subserve the interest of the community.    While if it was designed that such property could be taken only for the direct manual occupation of the public, the singular would have fully conveyed that idea, and would have been the more correct form of expression.

2.    The broader application of the term is to be inferred from contemporaneous and long continued practical construction given to it by legislation and the general acquiescence.    From about the time of the adoption of the constitution up to the present day, there has been an almost unbroken series of grants, by general laws and private charters, of rights in individual property for purposes beneficial to the public in various degrees and ways ; in cases of highways for the accommodation of the public and of individuals, turnpikes, aqueducts, mills, locks and canals, bridges, booms, railways, school houses, cemeteries, &c.

These grants have conferred every interest in land, from the slightest temporary easement, to the fee itself; they have sometimes given to the community the right of enjoying unrestrictedly the property assumed, as in the case of highways ; at other times the right of enjoyment in certain modes or upon certain conditions, as in case of railways and canals, and in not a few instances, they have given to the entire community no immediate right of enjoyment, but in lieu thereof the benefits which flowed to them from the occupation of the property by a limited number of persons, as in the case of mills, aqueducts, highways for the accommodation of individuals, school houses, the coast survey, (Act of 1846,) &c.

We ask attention particularly to grants of easements for mills, as most resembling in their purposes and manner of use, those of this company ; though in the scope and extent of their operations, and the benefits, immediate and incidental, which they secure to society, there can be little comparison between the saw and grist mills of a generation ago, and an extensive manufacturing establishment of the present day.

In 1718 the provincial government of New Hampshire enacted a law entitled an "act for the regulating of mills," found in the Provincial Laws (1721,) ch. 60, p. 72, in these words :

Sec. 1.    "Be it enacted by His Excellency, the Governor, Council and Representatives in General Assembly convened, and by the authority of the same, that every miller shall be provided of scales and weights to weigh corn, to and from the mill, if desired.    And the toll for grinding all sorts of grain (but Indian corn, for which the mill shall take one twelfth,) viz., one sixteenth part and no more ; any law, usage or custom to the contrary notwithstanding.

Sec. 2.    "And be it further enacted by the authority aforesaid, that where any persons have already, or shall hereafter, set up any water mill or mills, upon his or their own lands, or with the consent of the proprietors of such lands legally obtained, whereupon such mill or mills is, or shall be erected or built, then such owner or owners shall have free liberty to continue and improve such pond for their best advantage without molestation.

"And if any person or persons find themselves aggrieved and damni-

fied in their propriety of lands by reason of its being flowed by the owner or occupant of such mills stopping or raising the water, that in every such case the party so damnified in his propriety, upon application for relief to the court of general sessions of the peace in this province, the said court be and hereby are empowered to issue out a warrant, directed to the sheriff, to summon and impannel a jury of good and lawful men, at the proper cost and charge of the owner or owners of such mill or mills; and the jury shall be sworn by a justice of the peace to a faithful indifferent appraisal of the damage done to the person complainant, by flowing his or their land or marsh; and the jurors' verdict being returned by the hand of the sheriff to the next court of quarter sessions of this province, being allowed and recorded, shall be a sufficient bar against any action to be brought for any damages occasioned by flowing of any such lands or marsh as aforesaid; save only an action of debt which the complainant may bring for the recovery of such sum or sums of money from the owner or occupant of such mill assessed as aforesaid. But if the jury find no damage for the complainant, then he or they to be at the cost of the jury, as shall be allowed by the justices of said court."

This act remained in force until it was repealed by the "act to repeal sundry statutes and laws therein mentioned," passed June 20, 1792. N. H. Laws (1805,) pp. 401–3.

The former constitution of New Hampshire, adopted in 1783, contained an article in its Bill of Rights, (Art. 12,) precisely in the language of the 12th article of the Bill of Rights in the present constitution. N. H. Laws (1792,) p. 24.

The "act for the regulating of mills" continued in force, therefore, during nine years, from 1783 to 1792, while the constitutional provision was exactly the same as at the present time. Nor can it be said to have been repealed on account of the new constitution; because, (1) it only shared the fate of some two or three hundred other acts of all descriptions, upon a general revision of the statutes; (2) the first section, regulating the rate of tolls, was repealed, as well as that portion giving the right of flowage, and leaving no law as to tolls till a new one was enacted, Dec. 9, 1797, (N. H. Laws 1805, p. 339,) and (3) because the new constitution was not established till Sept. 5, 1792, or nearly three months after the act was repealed.

In 1810, (MS. acts of 1810, in office of Secretary of State, p. 348,) a charter was granted to Jonas Warren & als., to build a dam and mills on the Connecticut river between Littleton and Waterford, containing this proviso:

"Provided likewise that the dam shall not be constructed so as to obstruct the passage of lumber in said river, nor flow any land to the damage of the owner thereof, without paying a reasonable compensation therefor."

In 1820, (MS. acts of 1820, p. 504,) a charter was granted to the Sunapee Dam Corporation, the second section of which is as follows:

"The corporation is empowered to sink the outlet of Sunapee lake at the source of Sugar river to the depth of ten feet below low water mark

of the lake, and erect and maintain a dam there with gates and flumes to the height of low water mark for the benefit of their mills and privileges, provided said corporation shall make or tender reasonable compensation for all damages which may accrue to individuals from the erection of the dam and works."

We refer the court also to the following charters :

Blodgetts' Mills, 1811 ; Conway and Eaton Canal, 1824 ; Sewell's Falls Locks and Canal, 1833 ; Sewell's Falls Locks and Canals, (amended) 1836.

We give, also, only a small portion of the cases in which the right of eminent domain has been exercised by the legislature of this State.

### PRIVATE ACTS.

N. H. Turnpike, 1796 ; Portsmouth Aqueduct, 1797 ; Exeter Aqueduct, 1801 ; Tenth N. H. Turnpike, 1803 ; Charlestown Turnpike, 1803 ; Londonderry Turnpike, 1804 ; White River Falls Co., 1807 ; Dover Aqueduct Co., July 2, 1823 ; Grafton Canal Co., Dec. 10, 1824 ; Winnipisseogee and Piscataqua Canal Co., Dec. 16, 1824 ; Conn. River Navigation Act, 1826, p. 117 ; Merrimack Locks and Canals, 1827, p. 235 ; N. H. Canal and Steamboat Co., 1827, p. 240 ; Conn. River Canal, 1828, p. 325 ; John's River Canal Co., 1836, p. 319 ; Dead R. Lumbering Co., 1836, p. 331 ; Umbagog Co., 1837, p. 343 ; Gilbert's Bridge Co., 1839, p. 452 ; Pemigewasset Boom, 1844, p. 212 ; Piscataqua Aqueduct, 1846, p. 437 ; Androscoggin Boom Co., 1851, p. 1143 ; Belknap Aqueduct, 1851, p. 1146 ; Androscoggin R. Improvement Co., 1852, p. 1191 ; Mountains Carriage Railway, 1858, ch. 2157 ; Mt. W. Summit Road Co., 1859, ch. 2314 ; N. H. Bridge, 1859, ch. 2313 ; Keene Water Works, 1861, ch. 2545 ; Amoskeag Man. Co., 1861, ch. 2548.

### PUBLIC ACTS.

In relation to highways, for accommodation of public and individuals ; railways ; school houses ; repairs of mills and meeting houses ; sale of common lands ; coast survey ; public cemeteries.

We also cite the following decisions in this State :

*Petition of Mt. Washington Road Co.*, 35 N. H. 134 ; *Concord Railroad* v. *Greeley*, 17 N. H. 47.

It thus appears, that, in this State, legislative acts in force for years after the establishment of the constitutional restriction, and passed at brief intervals from that time to the present, for the most part unquestioned by the community, but sustained by the courts whenever brought before them, have sanctioned the use of the right of public domain in cases involving substantially the same principles as the one under consideration, and certainly presenting no more urgent claims for favorable regard.

In this connection the course of legislation and judicial decisions of

our sister State of Massachusetts under a similar constitutional provision, cannot be without weight.

The constitution of Massachusetts was adopted in 1780, and contains in the 10th article of its declaration of rights the following clause :

"But no part of the property of an individual can with justice be taken from him or applied to public uses, without his own consent, or that of the representative body of the people."

The provincial statute of 12 Anne c. 8, (A. D. 1714,) found in Anc. Chart. p. 404, is almost the same verbatim, as the second section of the "act for the regulating of Mills," passed in New Hampshire, in 1718, and quoted in full, *supra*. The only difference is that in Massachusetts the *yearly* damages to the complainant were to be assessed by the jury.

This act was in force till 1795, fifteen years after the adoption of the constitution, when, on a revision of the laws, another act was passed (c. 74,) which it is understood was not repealed until the enactment of the Revised Statutes in 1836, by the passage of another act (c. 116,) which in its turn gave place to c. 149 of the General Statutes, in 1860, still in force ; all of said acts being based upon the same principle, and of the same general character. There has been no time since 1714 when Massachusetts has been destitute of a flowage law.

The constitutionality of these and other similar acts has been judicially asserted by the courts of that State in numerous cases, of which we cite the following : *Boston and Roxbury Mill Dam Co.* v. *Newman,* 12 Pick. 479 ; *Lumbard* v. *Stearns,* 4 Cush. 60 ; *Hazen* v. *Essex Co.,* 12 Cush. 475 ; *Talbot* v. *Hudson,* 24 Law Rep. 228.

It may not be unimportant also, to state that flowage laws exist in fifteen or more States in the Union ; among them, Massachusetts, Maine, Rhode Island, Virginia, North Carolina, Kentucky, Tennessee, Indiana, Missouri, Mississippi, Alabama and Florida.

3. The principle upon which the right of eminent domain is based, forbids the narrower construction of the constitutional limit to its exercise. *Privatum incommodum publico bono pensatur,* is the maxim of the law on this subject. It is better that one should suffer than many. If this principle sanctions the appropriation of private property in cases where it will benefit the public by being taken directly into their own possession, does it in any way imply that such property may not be appropriated in any other mode which will yield an equal benefit to the public? The principle is in no way affected by the mode of disposal or use of the thing taken ; it regards only the result—the public advantage. And if the founding of a great manufacturing establishment, though the public have no absolute right to use directly its wheels and machinery, its dams and reservoirs, but which is of such extensive scope and operations that it builds up a town, affords employment and support for thousands of persons, furnishes markets for agricultural, mechanical and commercial industry, provides roads, schools and places of public worship, and produces fabrics to supply the necessities and promote the comfort of tens or hundreds of thousands, annually, may not justify the assumption of private property, what can be said in favor of a highway

laid for the accommodation of a remote householder, and used by a score or two of persons in a year, even though the community have in theory the right to travel upon it?

II.   But even if the narrower construction were to be given to the term *public uses*, in the constitution, the act under consideration cannot be regarded as an infringement upon it.

From the statutes and authorities cited, it is abundantly shown that it is not necessary to constitute a case of public use, that the public should have the *unrestricted* enjoyment of the thing appropriated, but only the option of enjoying it under reasonable regulations and conditions. Thus, in case of railways, one can only avail himself of them, at stated hours, upon the payment of tolls, and upon the observance of fixed rules.

It also appears that it is not essential that the *whole body of the community* should have the right of enjoyment of the property taken, upon any terms ; it is sufficient if a smaller number are entitled to that privilege.   Thus in case of school houses, the land of an individual may be taken for a building merely to accommodate a score of children for study, and their fathers for annual meetings.

Now by the terms of their charter, it is true this company is not *compelled* to give to every applicant the opportunity of employment upon its works.   But *practically*, its mills are open to the entire public, upon compliance with no difficult or unreasonable regulations.   The laws of business are in this respect as imperative as the provisions of an act of incorporation.   All persons who possess the ordinary requirements of honesty and capacity, and are willing to render their services for liberal compensation, may find occupation there, so long as the company can furnish it.

And the persons actually employed upon the works of the company, constitute a far larger portion of the community, than are contemplated in many cases in general laws of undoubted validity, as the public for whose use the property of individuals may be taken.   The Great Falls Manufacturing Company furnishes occupation for more than two thousand persons, who thus have manual occupation of the easement in other's lands, conferred upon them through the medium of the corporation ; and who are in this way enabled to produce for the public fifty thousand yards, or more than thirty miles in length, of cloth per day.

We submit, therefore, that however the court may think it proper that the language of the constitution should be construed, the "act in relation to the Great Falls Manufacturing Company" comes fairly within the powers given to the legislature by the organic law of the State.

But even if, which we cannot for a moment believe, the court should regard it as a doubtful question, notwithstanding the legislation and practice and decisions in this and other States, this is emphatically a case for the application of the well established rule, that every presumption is to be made in favor of the validity of a legislative enactment in due form, and it will not be held unconstitutional unless shown to be so beyond reasonable doubt.   *Cooper* v. *Telfar*, 4 Dallas 14 ; *Willington, Petitioner*, 16 Pick. 95 ; *Dearborn* v. *Ames*, 8 Gray 21 ; *Talbot* v.

*Hudson, ubi supra; Lunt's Case*, 6 Greenl. 412 ; *Rich* v. *Flanders*, 39 N. H. 304.

The other position of the defendants, if we understand it aright, is that the plaintiffs' act of incorporation did not confer upon them the right to flow the lands of others, nor did their act of 1862, from which the defendants argue that the right cannot be given by the joint operation of both acts. But we apprehend, that, if we were to admit the premises, no such conclusion would follow. It is by no means true that two enactments may not, in conjunction, give powers and privileges which neither gives of itself. The rule of interpretation of statutes is, not that each must be regarded separately and independently of others, but that all statutes relating to the same subject are to be construed in connection with each other, and as constituting portions of a harmonious whole. 1 Kent's Com. 463 ; *Sloan* v. *Bryant*, 28 N. H. 71.

The act of 1862, therefore, is to be taken as relating to, and supplementary of, the original charter of the plaintiffs, just as much as if it had been incorporated into it. And though the court were to find that neither act singly gives to the plaintiffs a right in the lands of others, yet if both in combination are necessarily or properly to be construed as doing so, we assume that no difficulty or doubt will arise in giving them that effect.

The deficiencies in the original charter being thus remedied by the provisions of the act of 1862, for the reimbursement of land owners and the acquisition of title by the plaintiffs thereupon, the plaintiffs have now the right of holding back water by means of their dam and works, upon *all* lands where it may be necessary, in the proper exercise of their privilege of manufacturing ; and so we submit, by the conjoint operation of the plaintiffs' act of incorporation and act of 1862, plaintiffs have now a complete flowage act.

But it is urged that the preamble of the act of 1862 contains the false assumption that an absolute right of flowage was granted by the act of incorporation. If the contents of the preamble were of consequence, it would be a complete answer to say that the right *was* given, in language sufficiently comprehensive, though for want of other provisions, the act was not operative to that entire extent.

But the form of the preamble is of no importance. It is, in strictness, no part of the statute ; whatever its terms may be, the true meaning is to be sought from the body of the act itself. 1 Kent's Com. 460–1, and cases cited.

PERLEY, C. J. One of the positions taken by the defendants, I understand to be this ; the original act of incorporation did not authorize the company to flow the land of others without their consent ; the act of 1862 relates only to such doings of the company as were authorized by the act of incorporation, to such doings only as were legal and rightful under the act ; and therefore this case does not come within the act of 1862, because flowing the land of the defendants without their consent was not authorized by the act of incorporation, and is illegal and wrongful. I have no difficulty in agreeing with the defendants that the origi-

nal act of incorporation did not give the right to flow the land of others without their consent. It gave the power to sell and to hold and use property, in a corporate capacity, for the purposes indicated in the act; but it could not have been intended that the company, under this grant of corporate powers, should have the right to take land, or any interest in it, without the owner's consent. If such were the intention, the act *pro tanto* would·be void, because it provided no method of awarding compensation to the owner. *Piscataqua Bridge* v. *N. H. Bridge*, 7 N. H. 35.

But it was not in the lawful and rightful exercise of the powers conferred on the company by the act of incorporation that the cases contemplated by the act of 1862 would arise. If they were exercising their corporate powers rightfully, there could be no grievance, and no damages to assess. That act applies only to cases where the company, in the exercise of those powers, have caused a grievance or damage. All acts of corporations, for which they are responsible in their corporate capacity, are done in the exercise of their corporate powers. If acting within the scope of their general corporate authority they do an injury to others they are answerable like natural persons. In the present case, the petitioners have authority under their charter to construct and maintain dams for certain purposes; if in the exercise of this corporate authority they had caused an injury or damage, they would have been liable to answer for the damage to the person injured in the ordinary course of the law, without resorting to the special remedy provided by this ancillary act. The act of 1862 clearly refers, not to the lawful exercise of the powers conferred by the charter, but to cases where damages and grievances have been caused by the wrongful exercise of the powers derived under the act of incorporation. The petition alleges, that, in the exercise of the powers conferred by the act of incorporation, the company have built and maintained a dam, which causes a grievance and damage to the defendants. This is, of course, wrongful, and not warranted to be done by the charter, though done by the petitioners in the exercise of their corporate powers; or, in other words, in their corporate capacity; for all corporate acts are done in the exercise of the powers conferred by the charter or act of incorporation. The corporation, in the case stated by the petition, exercise their corporate powers in a way to do a wrong and cause a damage and grievance to the defendants, by building and maintaining a dam, which overflows their land without their consent; and this, I think, is exactly the case contemplated by the act of 1862.

We are of opinion that the act of 1862 was intended to reach a case like that set forth in·this petition, where the corporation, in the exercise of their corporate authority to construct and maintain dams, have erected and maintained a dam, by which they overflow the land of another without his consent and without right; that the act was intended to provide a method of ascertaining the damage to the owner in the nature of a compensation for the perpetual right to maintain the dam and flow the land; and that, upon payment of the compensation ascertained according to the act, it was intended the corporation should have the perpetual

right to maintain the dam and flow the land; and that brings us to the question whether the legislature had constitutional power to pass the act.

The act of 1862 proposes to take the right of flowing land from the owner without his consent. This cannot be done unless the right is taken for a public use within the meaning of that term as used in the law on this subject, and in the constitution of this State.

No objection is made to the method provided by the act for ascertaining and paying compensation to the owner. Where property is taken for the public use it may be done by a general law, as in the case of highways; or by special acts, such as have been so often passed in reference to turnpike roads, railways, canals, aqueducts, &c. *Backus* v. *Lebanon*, 11 N. H. 19; *Concord Railroad* v. *Greeley*, 17 N. H. 47. It is not necessary that the right should pass directly to the public; it may be given to a corporation technically classed as private, provided the use is of such general benefit as to give it a public character. The present case does not seem to be embarrassed by any objection to the manner in which the right is proposed to be taken, or to the party that is to take it. The question is general whether the legislature have power to take such a right from the owner without his consent as for public use. If this case falls within a class, which is such in general nature and character that the legislature have power to take the right as for the public use, the court cannot inquire whether the power was discreetly exercised in this particular instance. *Petition of the Mount Washington Road*, 35 N. H. 134.

In all governments the right to take private property when required for the public use has been exercised; and in all enlightened and just governments the duty is recognized of providing, where it can be done, for compensation to the owner. Our constitution asserts on this subject a general principle of public law. It states directly that no man's property shall be taken from him or applied to public uses without his consent, or that of the representative body of the people, and by necessary implication admits the general doctrine that a man's private property may be taken from him for public uses without his consent by the legislature, on the implied condition, however, that he is to receive a just compensation. Bill of Rights, 12th article. The constitution has not undertaken to define what shall be regarded as a public use. That is left to be determined in each individual case by reference to the principles and reasons, upon which the right to take private property for the public use is founded, and by authority.

The right of the public to resume private property for the public use, which has been called the right of eminent domain, is said to be implied in the original social compact; and is not limited to cases of urgent necessity, such as occur in war, or the sudden calamity of a great fire; but reaches to all cases of general public utility. *Non tantum ex summa necessitate quae privatis quoque jus aliquod in aliena concedit, sed ob publicam utilitatem, cui privatas cedere illi ipsi voluisse censendi sunt, qui in civilem coetum coierunt.* Grotius de Jure, H. Lib. III. CXX. S. VII. The general doctrine is stated in the recent

and much considered case of *Gilmer* v. *Lime Point*, 18 Cal. 225, as follows : "The public use may have relation to any purpose, civil or military, without the compass of the State authority, which subserves the general interest. The only test and criterion of the admissibility of the power are that the particular object tends to promote the general interest in its relation to any legitimate objects of government." According to *Bradley* v. *The N. Y. & N. H. Railroad*, 21 Conn. 294, "the use is to be regarded as public, if a general public benefit results from it."

The general statement of the case on the part of the petitioners, is, that, under the authority of the legislature, they associated in a body corporate for the purpose of carrying on the manufacture of cotton and woolen goods, and have expended large sums of money in constructing dams and other works, and in acquiring the right to flow land, and have thereby obtained a water power on Salmon Falls river, sufficient for large and successful works ; that the defendants claim title to a small and not valuable piece of land, which is flowed by the dam of the petitioners ; that they have not agreed on a sale of the right to flow this piece of land, and the defendant, Fernald, has given notice of his grievance. If the defendants unreasonably refuse to part with this right, the business of the petitioners is in danger of being interrupted and greatly embarrassed, and their whole enterprise defeated by the obstinate refusal of the defendants to part with this right on reasonable terms. The question is, whether it is of such public advantage that this obstacle to the successful prosecution of the petitioners' business should be removed on payment of just compensation to the defendants, that the right would be taken for a public use, within the meaning of the term as used in the law on that subject, and in the constitution of this State? Or, to put the question in a general form, is it of such general public advantage that the streams and waters of this State should be brought into practical use for manufacturing purposes, that a private right standing in the way of an enterprise designed to accomplish extended and connected improvements in the water power of a large stream like the Salmon Falls river, is taken for a public use when taken to advance such an enterprise and remove an obstacle to its success?

If we look to the example of other States, we find that many of them have exercised the power to take the right of flowing land for mills and other works without the owner's consent. In most cases, the power to do this would seem to have been conceded without question ; and so far as my inquiries have gone, in all cases where the right to do this has been questioned in the courts, it has been sustained.

In the *Mill Dam* v. *Newman*, 12 Pick. 467, the plaintiffs were incorporated with authority to erect and maintain dams, &c. ; and the act of incorporation provided that any person or corporation, sustaining any damage by the building of said dams, &c., or from the exercise of any of the rights given by the act to the corporation, might apply to the court of common pleas to estimate the damage. It was held that the construction of dams by a corporation in order to obtain a head and fall of the waters of a navigable arm of the sea, whereby to work grist mills

and mills for other useful purposes, and also to make a highway over dams for the accommodation of all persons at a fixed toll, is an enterprise so far of a public nature as to authorize the legislature to appropriate the property of an individual to carry it into effect.   The constitutional authority to apply private property to such a use, was put, in argument, on the ground that "the legislature will not permit an individual, from caprice or obstinacy, to withstand the development of great natural advantages ;" and *Putnam, J.*, in delivering the opinion of the court, says : "In regard to manufacturing establishments is it nothing to the public that great numbers of citizens have the means of employment brought to their homes?   It is among the most pleasant considerations attending this branch of the subject that the interest or benefit arising from manufacturing establishments is distributed quite as much and oftentimes more among the laborers and operatives, than among the proprietors of the works."

In *Hazen* v. *The Essex Co.*, 12 Cush. 475, the defendants were incorporated for the purpose of constructing a dam across the river Merrimack, and one or more locks in connection with the dam to remove obstructions in the river by falls and rapids, and to create a water power to be used for mechanical and manufacturing purposes.   The plaintiff had a mill on a small stream running into the river above the dam, and complained that the dam flowed the water back on his mill.   The act of incorporation provided, that, in case of injury caused by the dam, the damages should be ascertained in the method provided for assessing damages caused by railroad corporations.   The court held the plaintiff's only remedy was that given by the act of incorporation, and that it was within the power of the legislature to give the right of flowing the plaintiff's mill as for a public use.   *Shaw, C. J.*, said : "The establishment of a great mill power for manufacturing purposes as an object of great public interest, especially since manufacturing has come to be one of the great public industrial pursuits of the commonwealth, seems to have been regarded by the legislature, and sanctioned by the jurisprudence of the commonwealth, and in our judgment rightly so, in determining what is a public use, justifying the exercise of the right of eminent domain."

In *Newcomb* v. *Smith*, 1 Chand. Wis. 71, and in *Thien* v. *Voegtlander*, 3 Wis. 714, it was decided that an act authorizing land of others to be flowed by mill dams was constitutional, if the act made suitable provision for compensation to the land-owner, upon the ground that in such case the right to flow was taken for a public use.   So it has been held that land taken to drain swamps is taken for a public use, *Hartwell* v. *Armstrong*, 19 Barb. 166 ; and the right to flow land for the use of a canal, *Wabash Canal* v. *Spears*, 16 Ind. 440.

A general statement of the decision in *Saddler* v. *Langham*, 34 Ala. 311, where it was held that the flowage and private road law of that State was unconstitutional, might seem to imply a contrary doctrine ; but it was there conceded that the legislature had power to authorize land to be flowed without the owner's consent, for mills and works of a certain character, and the decision was put on the ground that the legislature by "the employment of a generic phrase, without explaining the

different species included in the genus, attempted by words not separable to confer a general authority, a part of the patent objects of which are within, and others without, the pale of constitutional power;" and in such case the court held themselves bound to pronounce the whole clause unconstitutional, p. 333. That is to say, the terms of the law were so broad as to include some cases where the land would be taken for a mere private use, and therefore, though in other cases the use would be public, the whole act was void. That case cannot be regarded as an authority against the power of the legislature to authorize land to be flowed for such a purpose as is set forth in this petition ; and I have met with no other that can be supposed to give any countenance to the position that the exercise of such a power is beyond the general scope of legislative authority.

By the constitution of this State, legislative power is conferred on the general court in these terms : "Full power and authority are hereby given to the said general court, from time to time, to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions and instructions, either with penalties or without, so that the same be not repugnant or contrary to this constitution, that they may judge for the benefit and welfare of the State." Constitution, Art. 5. There is nothing in the constitution to restrain this general grant of legislative power from being exercised in reference to this subject of applying private property to public uses. On the contrary, this right is distinctly recognized in the 12th article of the Bill of Rights before cited. There is, therefore, nothing in the constitution which limits the general exercise of legislative authority over this subject. The whole power of the government over it is lodged by the constitution in the general court. The provision that private property shall not be applied to public uses without the consent of the representative body, may have been introduced to guard against the usurpation of that power by the executive department, in imitation of the royal governors, who had assumed the right to dispose of the public lands by executive grant.

If we are to follow the example of other governments, and the decisions in other jurisdictions, it would seem to be clear, that to create and improve water power in the streams and waters of a country, is a matter of such general public advantage, that private property taken for that purpose is taken for a public use, within the legal meaning of that term ; that, in the language of our constitution, the exercise of the power to grant the right of taking private property for that purpose in a proper case, would, in the language of the constitution, be for "the welfare and benefit of the State." And we are led to the conclusion, that, under the ample grant of legislative authority conferred by the constitution on the general court, they had power to pass the law in question ; unless there was something in the previous or contemporaneous practice of the province or State ; or there is something peculiar in the business and the natural productions and resources of the State, from which we can infer an intention to limit and restrain this general grant of legislative authority in reference to this particular subject of taking a private right to create and improve water power.

I have not been able to learn that, at the time when the constitution was adopted in 1792, any private act of the provincial or State legislature had been passed, giving the right to take private property for any public use; but by the general law it was liable to be taken in two classes of cases, namely, for highways and for mills. It is certainly material to observe that when the constitution was adopted, we have no information that private property had been taken without the owner's consent, either by private act or by the general law, for any other than the two purposes above mentioned, and of these two, one was the right of every owner of a water mill, under the act of 4th Geo., Anno 1718, to flow water on the land of others by any dam built on his own land, or, by license, on the land of others, upon paying the compensation provided by the act.

From this it very clearly appears, that, in the legislation and practice of the province and State, it had been long recognized, and was, when the constitution was adopted, as within the general scope of legislative power, to authorize private property to be taken for the purpose of erecting and improving water power in the streams and waters of the State, when, in the opinion of the legislature, the public good required it. If the constitution is to be interpreted by what we must suppose to have been the contemporaneous understanding in reference to the power of the legislature to grant the right of taking private property for such a purpose, the fact that this power was exercised under the general law when the constitution was adopted, and had been, from 1718 to that time, would seem to be decisive. The subsequent repeal of the statute shows that, in the altered condition of the country, the legislature did not consider it to be expedient that every man, who might erect a water mill for any purpose, should continue to have this uncontrolled power of flowing the land of others without their consent. But the repeal itself shows that it was understood to be a matter entirely within the power of the legislature; a power which they could exercise, or forbear to exercise, at their discretion, as in their judgment the public good might require. Looking to the condition of the law on that subject when the constitution was adopted, and the previous practice of the government, we can have no doubt it was then understood that the legislature, under the constitution, had power to give the right of taking private property for the purpose of creating and improving water power.

The practice under the constitution in reference to this general subject of authorizing private property to be taken for public use, supplies a great number of cases analogous to the present, embracing a wide range of objects, in favor of which the power has been exercised. Soon after the adoption of the constitution, certainly as early as 1794, in the case of the act incorporating a company for constructing locks round the falls in the river Connecticut, acts began to be passed authorizing private property to be taken without the consent of the owners for uses deemed to be public. These cases include acts incorporating turnpikes, canals, aqueducts, boom companies, railways, &c. It would seem by recurring to this practice of the legislature, that the right to authorize private property to be taken for public uses, has not, in this State, been nar-

rowed in construction by any technical rule, confining the exercise of the right to any particular class of subjects, but has been extended generally to cases where an enterprise promising important public advantages was liable to be defeated or embarrassed by the unreasonable refusal of individuals to part with the private right. It is not easy to distinguish in principle the present case from the numerous grants of corporate powers with this right to companies incorporated to improve the natural advantages of rivers and streams, for purposes of transportation by canals and booms. In those cases, as in this, the object was to improve those natural advantages for the public benefit.

There are also several instances, in which grants have been made to flow lands by mill dams, that cannot, in any point material to this question, be distinguished from the present case; such as the grant to build mills and dams on the river Connecticut between Littleton and Waterford, in 1810; to the Sunapee Company in 1820; and to the Amoskeag Company in 1861. This is not, then, a new power, claimed for the first time in this instance, but a power exercised by the provincial and State governments under a general law, from 1718 to 1792, and since by the legislature in repeated private acts.

Whether the public have such an interest in improving the water power of the State and turning it to practical use, as will authorize the legislature to take private property for that purpose, may very much depend on the character of the business and employments of the people, and on the natural productions and resources of the State. In this point of view there is certainly nothing in the peculiar circumstances of the State to limit and restrain the ordinary exercise of legislative authority over this subject. Our soil and climate forbid us to enter into competition with the great producing States of the Union, in the sale of such agricultural productions as are sent to the great markets of the country; we are purchasers, and not vendors, of such productions. The prosperity of the farmer mainly depends with us on having close at hand a market for such products of his farm as cannot be advantageously transported for long distances, and in which he does not come into competition with the great producers of the West. Such a market can be furnished only by his neighbors, who are engaged in mechanical and manufacturing pursuits. The farmer, therefore, has an obvious and deep interest in those pursuits; and large manufacturing establishments not only afford a market for agricultural productions, but give profitable employment to great numbers of men and women, disburse large sums of money, and create a new demand for wood, timber, and other commodities.

The business of manufacturers and mechanics in this State is largely dependent for success on the use of water power. To create a water power in a large stream sufficient for manufacturing on an extensive scale, it is generally found necessary to dam the water in the stream itself, and also to raise and retain it in natural or artificial reservoirs connected with the stream, as has been done by these petitioners, in order to ensure an adequate and constant supply at all seasons of the year. In most cases, to do this, the right to flow the land of numerous proprie-

tors must be obtained; and an individual, or a few individuals, might defeat or greatly embarrass the whole enterprise by an unreasonable and obstinate refusal to part with the right.   In such a case can it be doubted, that, to remove this obstacle to a great public improvement, in which large numbers are interested, would be, in the language of the constitution, "for the benefit and welfare of the State;" and that a private right taken for that purpose, would be taken for a public use within the legal meaning of that term ?

No State of the Union is more interested than ours in the improvement of natural advantages for the application of water power to manufacturing purposes.   Nature has denied to us the fertile soil and genial climate of other lands, but by way of compensation has endowed us with unrivalled opportunities of turning our streams of water to practical account.   The present prosperity of the State is largely due to what has already been done towards developing these natural advantages; and there is no assignable limit to our resources in this respect if extended and connected enterprises for the improvement of the water power in the State should be successfully prosecuted hereafter.   In no part of the world have the public a deeper interest in the success of all undertakings, which promise to assist in the development of these great natural advantages.

Whether, therefore, we look to the interpretation which has been given in other jurisdictions to the term *public use*, in reference to the right of taking private property for such a use; to the legislative practice under the provincial and State governments before and at the time when the constitution was adopted; to the language of the constitution itself; to the early and continued legislative practice under the constitution; to the decisions of the courts in this State; or to the character of our business and the natural productions and resources of the State, we are drawn to the conclusion that the legislature have power to authorize a private right that stands in the way of an enterprise set on foot for the improvement of the water power in a large stream like this river, to be taken without the owner's consent, if suitable provision is made for his compensation; and that the act of 1862 is constitutional and valid.

The petition does not allege that Sarah W. Worster has given notice of her grievance, and as to her it does not appear that the provisions of the act have been complied with; but the demurrer is general to the whole petition, and must be overruled.