Mar. 20, }
  1876. }      AMOSKEAG MANUFACTURING CO. *v.* HEAD.

*Constitutionality of the flowage act of 1868.*

The flowage act of 1868—Laws of 1868, ch. 20—is not unconstitutional.

FROM MERRIMACK CIRCUIT COURT.

This is a petition for the assessment of the defendant's land damages, under chapter 20 of the laws of 1868, entitled "An act to encourage manufactures." The petition states, among other things, " That said Amoskeag Manufacturing Company, under the authority so granted,

---

have purchased the land on both sides of Merrimack river at Amoskeag falls, and including the river and falls, and have there erected mills, dug canals, and established works, at a cost of several millions of dollars, and have encouraged others to also erect mills and works at an expenditure of several millions of dollars more, and intend erecting other works and mills at a large expense, and for the purpose of rendering the water-power of said river at said falls available for the use of such mills and works, have there constructed a dam across said river, and placed flash-boards thereon as part of said dam ; that the construction of said mills and dam, and placing flash-boards thereon to raise the water for working said mills and works, and for creating a reservoir of water, and for equalizing the flow of the same for the use of such mills, is of public use and benefit to the people of this state, and that the same is necessary for the use of the mills for which it is designed."

The defendant filed a demurrer, and assigned as cause that "The statute, by which the plaintiff proposes to take the defendant's land and have the damages assessed, is unconstitutional and void."

The questions thereupon arising were transferred to this court for determination by FOSTER, C. J.

*C. R. Morrison*, for the defendant.

I. The public have no other or different rights, in respect to the property or business of the plaintiffs, than in respect to the property and business of any and every person and corporation in the state.

II. If the legislature can authorize the taking of the defendant's property by the plaintiffs, without his consent, it can authorize the taking of his property by any corporation or person, whether engaged in manufacturing, trading, farming, or mechanical business : for every useful business is conducive to the public welfare.

III. And it can authorize towns and cities to loan their credit, and impose taxes in aid not only of the plaintiffs' business, but of any laudable private and mere private enterprise, for it can impose taxes for any object for which it can take private property.

IV. And it can also take the plaintiffs' mills and water-power, not only for the use of some other corporation engaged in like business, but even for the benefit of any lawful scheme for making money, by which the public would be more or less benefited.

V. On the contrary, we say that a taking for "public uses," within the meaning of our constitution, is only where there is a taking for the use of the public in some form, and that use not permissive but of right, and by compulsion if need be. *Tyler* v. *Beacher*, 44 Vt. 648 ; *Loan Association* v. *Topeka*, 20 Wall. 655 ; *Allen* v. *Joy*, 60 Me. 124 ; *Cleaveland* v. *City of Iola*, 9 Kan. 684; *Curtis* v. *Whipple*, 24 Wis. 350 ; *Whiting* v. *Ford*, 25 Wis. 188; *Jenkins* v. *Sanderson*, 103 Mass. 74 ; *Lowell* v. *Boston*, Law Review, July, 1873 ; *Stewart* v. *Supervisors*, 30 Iowa 24 ;—see, also, Mr. Carpenter's argument in *Ash* v. *Cummings*, 50 N. H. 591, and a brief herewith presented, prepared in the same case.

VI. It follows that a taking of the defendant's property without his consent, as prayed for in the plaintiffs' petition, would be contrary to our bill of rights, and against first principles. *Concord Railroad* v. *Greeley*, 17 N. H. 47 ; *Loan Association* v. *Topeka*, before cited.

VII. It follows, also, that such a taking falls within the prohibitions of the fourteenth amendment to the constitution of the United States. *Mayo* v. *Wilson*, 1 N. H. 57 ; *Hutchins* v. *Edson*, 1 N. H. 140 ; Cooley on Const. Lim., 2d ed., *294.

Mr. Morrison also furnished the following argument, prepared by him in *Ash* v. *Cummings* :

1. The most important question is as to the meaning of the terms " public use " and " public uses," as used in the constitution of the United States and of this state. The fifth article in amendment of the constitution of the United States declares that private property shall not be taken for public use without just compensation. The twelfth article of our bill of rights declares that no part of a man's property shall be applied to public uses without his own consent or that of the representative body of the people. The meaning of these terms seems plain enough upon their face. Any substitution of the words " public benefit," " public advantage," or " public good," for " public use " or " public uses," would be deemed unreasonable if not absurd, were there no motive to arrive at a different result from what the words naturally import ; and so of the terms as found in our reported cases, prior to *Company* v. *Fernald*. Thus, in 1 N. H. 131, *Dartmouth College* v. *Woodward*, RICHARDSON, C. J., after quoting the twelfth article of our bill of rights, says that the cases in which a man's property may be taken from him and applied to public uses, with the consent of the representative body, are not specified ;—and so of the opinions pronounced by PARKER, C. J. Thus, in 7 N. H. 68, 69, *Piscataqua Bridge* v. *N. H. Bridge*, while holding that corporate property is no more sacred than any other, he says it does not impair the plaintiffs' contract to hold that their franchise may be taken for public use,—that it is liable to be subjected to the public servitude and the public burdens,—but that no part of it can be taken from them except for public use, and upon adequate compensation being made ; and throughout the opinion he uses the words public use and public servitude as convertible terms ; —and in 8 N. H. 399, *Barber* v. *Andover,* in affirming the right of the legislature to authorize the laying out of a common public highway over a turnpike, provided compensation is made for property thus taken " for public use," he says it is true that the public have the right to the use of such turnpike road, under certain restrictions and limitations ; but the public may require a further use of it in a different manner, and there is nothing in the nature of the grant to the corporation, or any use of the property, which should prevent the public from taking it for use in such different manner if the public exigencies require it ;—and in 10 N. H. 373, 374, *Pierce* v. *Somersworth*, in deciding that where a

turnpike is so taken, the land-owners have not for that reason any right to further damages, he says that so far as they are concerned it is the substitution of a public right for a right previously existing, partly public and partly private, but co-extensive in its limits and duration for that which is substituted, and that they have already been paid for a perpetual easement and right of passage for the public ;—and in 11 N. H. 23, 24, in holding that a turnpike charter although a contract is not exempted from the right of eminent domain, he says that the corporation, like the individual, is guarded from a despotic exercise of power,—for whatever is taken must be paid for,—and that it may be true that the power does not extend to the destruction of rights, whether individual or corporate, merely because an opinion exists that it may be beneficial to the public that they should be extinguished. It may be (he says) that the power does not extend to cases where no public use can be had of what is taken, even if a provision for compensation was made ; but that no decision was necessary upon that point. In *Concord R. R.* v. *Greeley*, the court held, only after elaborate discussion, that a railroad of a private corporation, if for the use of the public by paying a toll to the owner, and subject to be regulated by law, may be authorized to take private property, and that such taking is for public uses. The whole course of argument is wholly opposed to the loose construction given in *Company* v. *Fernald ;* and even in the *Petition of the Mount Washington Road Company*, 35 N. H. 134–140, in which the opinion was given by PERLEY, C. J., the validity of the act was sustained upon the ground that the corporation was created for the purpose of opening, constructing, and maintaining a road for public travel, subject to a toll granted and limited by the act of incorporation, and that the road in its general objects and use was in no respect different from the numerous turnpike roads which have been made in this state. If, says the learned chief justice, the enterprise was of a public character and the road opened to public use, the legislature would have the power to authorize the taking of private property to accomplish the public object ; and that whether the public good required the legislature to exercise that power, in the particular instance, was a question for their discretion, and their decision could not be reversed in a judicial tribunal. It is obvious enough that, in the passages quoted, the term "public uses" is not by any means synonymous with public benefit, or public advantage ; and there is nothing in our reports, before *Company* v. *Fernald*, to give any countenance for such transmutation. The nearest approach to it is the language of Chief Justice RICHARD-SON, in 3 N. H. 534, where, in speaking of grants of the right to make a turnpike, he says that the power of the legislature to take the property of individuals for "public purposes" is indisputable ; and the language of WOODBURY, J., in 2 N. H. 25, that it has been always understood in this state, and all turnpike grants have been made on the hypothesis, that lands taken for turnpike roads are taken for "public purposes." But in these instances the context shows that the word purposes was used in the sense of uses. One definition of use, given

by Webster, is "application of anything to a purpose, good or bad." Judge WOODBURY had just said, a few lines before, that towns in which highways exist, being liable to repair them at great expense, if the old roads be appropriated to other purposes, may be considered as having a qualified interest in them.  If further confirmation were needed of the sense in which this distinguished judge used the word purposes, it is found in his opinion in *West River Bridge Company* v. *Dix*, 6 How. 546, 547.   This opinion, coming from one so well versed in our history, and eminently qualified to decide, we submit is entitled to very great weight, and, if concurred in, is decisive of this point.   We quote a portion of the opinion.   After saying that the cars, &c., could hardly be within any legitimate exercise of the right of eminent domain, although the road-bed may be, he says,—" Nor does the path for the road—the easement itself—if the use of it be not public but merely for particular individuals, and merely in some degree beneficial to the public.   On the contrary, the use must be for the people at large, for travellers, for all ; must also be compulsory by them, and not optional with the owners ;   must be a right by the people, not a favor ; must be under public regulations as to tolls, or owned or subject to be owned by the state, in order to make the corporation public for a purpose like this."

2.  Does the history of legislation in this state warrant the construction given to the word uses in *Company* v. *Fernald ?*   The judge who delivered the opinion in that case relies, in the first place, upon the act of 1718.   As stated by Mr. Carpenter, this act was passed before the adoption of our constitution, and is therefore of no weight.   We think that another sufficient answer to any argument based upon this act may be found in the character of the act itself, and in the nature of water grants both in this state and in Massachusetts in colonial times.   The act itself fully secures the use to the public, so far as grist-mills are concerned, and regulates the toll.   But the rights of towns were also, in most if not all cases, fully secured in relation to saw-mills and fulling-mills, in the grants for those objects.   The erection of such mills was a necessity, and in general could only be obtained by grants for that object, which were made upon conditions securing the public use ; and such mills were in fact public in their character and uses.   This is quite obvious from the preamble of the Massachusetts colonial act, of June 17, 1710, providing for repairs, which is as follows : " Whereas, frequently there are divers partners, owners of mills *erected for the common. use and benefit of the respective towns* wherein they are, and ofttimes improved by the inhabitants of neighboring towns, and forasmuch as, by reason of disagreement, death, or decay of some of the partners, or perplexity by entail on their descendants, mills sometimes fall to despair, and are rendered useless and unserviceable, if not totally demolished, to the hurt and detriment of the public, as well as loss to other partners, who stand ready to advance their parts of the charge for repairing, amending, or rebuilding the same : be it therefore enacted," &c.

Town histories and proprietary records would, it is believed, show

the same use as of right, and not of favor, secured to the public, in one form or another, by the terms of grants for mill purposes, as in the following instances: The first grist-mill in New England was the Neponset mill at Dorchester, Mass., erected in 1634. The records for the first years are wanting, it is said,—but it appears the town granted the privilege for a water-mill and bridge, and that the grant was confirmed by the general court; but the grantee was "to sell the alewives he took there at five shillings per thousand, and not sell or convey the mill without consent of the plantation. This restriction by the town was not taken off until 1785." History of Dorchester, pp. 34, 600, 603.

In 1665 a contract was made by the town of Groton, Mass., by which the town gave three acres of land upon which to erect a water-mill, to be exempted from taxation for twenty years; but the grantees were to grind the town corn sufficiently, "taking common toll only;"—and in 1673 there was a like contract with Jonas Prescott, by which, upon the like grant, he was to "grind the town's corn for every second and sixth day in every week;" and in 1681, with said Prescott, by which, upon a grant for a saw-mill, he was obligated to saw at the rates and upon the terms specified. Butler's History of Groton, pp. 36, 37.

The first saw-mill in Dunstable (now Nashua) was in 1679, by means of a town grant, which no doubt secured the rights of the town. Fox's History of Dunstable, p. 40.

In 1721 the proprietors of Chester made a grant of a mill privilege for a saw-mill, and ten acres of land gratis, with condition that the mill should be fit to cut boards in a twelvemonth, and that the grantees should saw at the halves the proprietors' logs, and sell boards at the rate of thirty shillings per M at the mill to such proprietors as should have occasion for the same, and make good any damage to any of the proprietors from the making of the pond or ponds. In September of that year a further grant was made to the same persons, and in consideration they were to build a grist-mill. In 1730 a similar grant was made to John Aiken, "provided said Aiken build a sufficient grist-mill by this time twelvemonth, and keep s$^d$ mill in good repair from time to time, and at all times hereafter" (it is said this was probably the first grist-mill in town); and an important grant to John McMurphy, in 1739, fully secured the proprietors and inhabitants of Chester, "and their successors." History of Chester, pp. 226–237.

The first saw-mill and grist-mill in Penacook (now Concord), about 1728, were under grants of fifty pounds for each, and fifty acres of land. The grantees, respectively, were obligated "to supply the town with good merchantable boards, of yellow pine, at thirty shillings per M, and good merchantable white pine boards at forty shillings per M, or else to saw each sort by the halves," and "to grind the town's corn, of all sorts, well and free from grit, for the usual toll;" and lastly, "the persons that should build said mills shall be entitled to the said lands, and also the stream or streams upon which said mills shall stand and be, *so long as they are kept in good repair*, and the end and design of the town in having *said mills answered*." Bouton's History, pp. 89–93.

Reading the flowage acts of 1714 and 1718 in the light of the history of those times, they rest on a substantial basis. There was not only a pressing want which could not otherwise well be met, but a public right, amply secured by grant as well as by legislation. But it is extremely probable that, by the time the restriction was removed from the Neponset mill (1785), mills without town aid, and without restrictions upon the owners except by statute, had become somewhat numerous ; and the Massachusetts act might well have been repealed as inconsistent with their constitution (the necessity and the public use no longer existing), as the New Hampshire act was repealed not long after.

Judge Cooley says,—" The reasons for such statutes have been growing weaker with the introduction of steam-power and the progress of improvement ; but their validity has been repeatedly recognized in some of the states,—and probably the same courts will continue still to recognize it, notwithstanding the public necessity may no longer appear to demand such laws." Cooley's Const. Lim. 534.

There has been no such repeated recognition in this state ; and the fact that we had no flowage act for almost three quarters of a century after the repeal of the colonial act in 1792 may be entitled to considerable weight.

In the second place, the court, in *Company* v. *Fernald*, rely upon three grants : To Joseph Warren and others, in 1810 ; to the Sunapee Company, in 1820 ; and to the Amoskeag Company, in 1861.

The practical, contemporaneous construction of a constitution or statute may be resorted to in aid of its meaning, if that is doubtful— *Concord Railroad* v. *Greeley ;* but, as we view it, the meaning is not doubtful, and, beyond dispute, neither of those acts can properly be regarded as contemporaneous with the adoption of our constitution, for the earliest was enacted thirty and the latest eighty years after that time. The act of 1861 was only a single year earlier than that before the court in *Company* v. *Fernald*, while to find the second we must go back forty years, and are then more than forty years from the adoption of the constitution. Those acts were hardly near enough to each other for telegraphic communication, and to call either of them contemporaneous with the framing of the constitution seems preposterous.

The bill for the amendment of the charter of the Amoskeag Company was introduced by Mr. Straw of Manchester, in his double capacity of general agent and representative we presume, on Friday, June 14. It was reported Friday, June 28, with an amendment excepting pending suits. It passed both houses on that very day, without debate or opposition, so far as can be gathered from the journals of the two houses, or the Concord dailies. That a measure of such a character should have passed without objection, may be accounted for, perhaps, from the all-absorbing topics then before the public. It was but ten weeks from the fall of Sumpter, and the million loan bill was the special order of the day in both houses, and earnestly debated by many patriotic gentlemen, including the member who introduced the bill.

The committee having the bill in charge gave so little attention to it, that they failed to discover that the recital in the preamble, of previous grants of a right to flow the land of others, was nothing better than an ingenious fiction. The original charter of 1831 only authorized the company to erect and maintain their works on land to be purchased by them. The amendment to their charter, June 26, 1838, gave them the rights of the Blodgett Canal Co., subject to all the restrictions to which it was subject; and, by the charter of that company, the dam authorized by it was not to extend more than " half the distance across the river." The canal was to be open for rafts and boats, the right to the public use was very fully secured, and a toll imposed to reimburse the company : it was a public enterprise, so far as any carried on through a private corporation can be so made or considered. The amendment of June 29, 1841, merely authorized an increase of the capital. This is all the authority cited by the counsel in *Eastman* v. *Company*, 44 N. H. 147, to flow any lands but their own ; and, as will be seen, and as was held in that case, it wholly fails to warrant the assumption of any such grant, either actually made or intended to be made.

Under all the circumstances, how much importance could justly have been attached to the act of 1861, in construing the similar act of 1862, obtained upon a like false pretence of similar grants? It is a singular coincidence, that the amendment to the Great Falls charter, and a whole batch of others procured upon equally false pretences, if not drawn by the same counsel as that of 1861, were evidently patterned after it, and engineered through the legislature in a time of great public anxiety, and with as little notice or opposition. The battle of Malvern Hills, at the close of the seven days' struggle, was July 1, 1862, and on the same day the president called for " three hundred thousand more." The bill for the amendment of the Great Falls charter was introduced on June 25, 1862, the first of the seven days' fighting. The times were eminently propitious to the designs of these corporations.

Going back forty years, to the act of 1820, it appears that that act, also, did not meet with the slightest opposition in either house. The same is true of the act of 1810.

The journal shows that John Pike and Thomas Pike presented a remonstrance against the petition upon which the charter of 1820 was granted to Josiah Stevens and others. But the ground of their objection does not appear, and I have been unable to obtain the remonstrance, if it is in existence. Both the petition and the remonstrance were referred to the committee on incorporations. That committee reported that the prayer of the petitioners be so far granted, that the petitioners have leave to bring in a bill. As no further objection appears, it is to be presumed that the bill, as introduced, was acceptable to both parties. It authorized the corporation, created by the act, to sink the outlet to Sunapee lake, at the source of Sugar river, to the depth of ten feet below the low water mark of the lake, and to erect and maintain a dam there to the height of said low water mark. A dam so con

structed would not ordinarily, if at all, flow the lands of anybody. There is no other grant of any right to flow ; and the saving clause— " provided said corporation shall make or tender reasonable compensation for all damages which may accrue to individuals by the erection of said dam and work "—must have been introduced by agreement, or to disarm objection. The bill was not before the judiciary committee at all.

Nor is there any grant of a right to flow, by the charter to Joseph Warren and others, in 1810. The preamble recites that certain persons named " have petitioned this court, praying the liberty to build a dam across the Connecticut river, within the limits of Littleton Bridge charter, for the purpose of erecting mills and machinery on said river ; which prayer appearing reasonable, therefore," &c. The act then gives to the petitioners the " exclusive privilege " of building a dam for such purpose, provided " they obtain the leave and consent of the said Littleton Bridge Corporation : provided, also, that nothing in this act shall be construed to debar the state from the privilege of granting, to any persons hereafter who may apply, the right of locking and canalling said river at the aforesaid place : provided, likewise, that the dam shall not be so constructed as to obstruct the passage of lumber in said river, nor flow any lands to the damage of the owners thereof, without paying a reasonable compensation therefor."

A like observation to that in respect to the Sunapee Dam Company is applicable to the act of 1810.

The proviso in relation to lands was evidently introduced to disarm objection, and to exclude any conclusion that it was designed to interfere with private rights.

It does not appear that there was ever any occasion for third persons to complain of any action under either of these charters, and so no presumption can arise of any acquiescence.

The acts of 1810 and 1820 are cited as a legislative construction. But even if it were true that there was an intention to give a right to flow the lands of third persons, it proves—if it proves anything—that the legislature gave a false construction to the constitution : for no mode is specified for ascertaining the damages, although it is perfectly well settled there must be, where the uses for which the property is taken are unquestionably public. That such is the requirement of the constitution is admitted by Judge PERLEY himself, in *Petition of Mt. Washington Road Co.*, 35 N. H. 142, where he says,—"When an act authorizes private property to be taken for public use, the law must also provide a legal method of ascertaining the amount of compensation to be paid. It is not enough that the owner may have his action to recover damages against the individual or corporation that enters on his land under the act."

Upon what principle of sound reasoning is a legislative construction, that is confessedly false, to be relied upon, in support of the authority of the legislature ? And that neither of these acts has a shadow of a claim to be regarded as a contemporaneous construction, is plain

enough, from the consideration that a whole generation had passed by before the earliest was passed.

These isolated, straggling, remote, private, and, at the most, confessedly unconstitutional acts of the legislature, as we submit to the judgment of this court, are of no force whatever against an otherwise uniform practice for three quarters of a century.

Grants to canal and bridge corporations, and for turnpike roads, where the rights of the public and the rates of toll are fully secured and regulated, so obviously rest upon a different principle, and are so clearly distinguished from the class of cases now under consideration, that we can only express surprise that the judge who delivered the opinion in *Company* v. *Fernald* should have referred to them as any precedent.

This disposes of all the private acts cited by counsel, or referred to by the court in *Company* v. *Fernald,* that grant any right to take land or property of others, except aqueduct charters. Of these last, we count six in all: The Portsmouth, in 1797; the Exeter, 1801; the Dover, 1823; the Piscataqua, 1846; the Belknap, 1851; and the Keene Water-Works, 1861. The last mentioned was only the year before the act then under consideration, and carries a public use on its face, the charter being to the town of Keene for the benefit of all its inhabitants.

The last section of the charter of the Belknap Company is as follows: "This act shall take effect upon the passage thereof, provided that nothing herein contained shall be so construed as to authorize said corporation to enter upon or appropriate any land, pond, or stream, for their use, without the consent of the owners." We notice a similar proviso inserted in the body of the charter of the Manchester Aqueduct Company, 1853.

The Portsmouth, Dover, and Piscataqua aqueduct charters gave a right to enter upon and break up the ground and dig ditches, in any land or highway; and if the corporation and the owners should not agree, the damages were to be assessed by a committee, on application to the court.

Those charters do not, in express terms, secure a public use to the inhabitants; but the right to take for such purposes—if the rights of the public were properly secured—is undoubted, and a plainer case can hardly be supposed. Upon the face of the charters, the use is for the inhabitants; and it has been held that a corporation, taking a charter for such purposes, will be liable to indictment if they refuse the use of the water to the inhabitants upon reasonable terms. The public use may be said to be fully secured by the principles of the common law, as in the case of a ferry. *Lumbard* v. *Stearns,* 4 Cush. 60; *Charles River Bridge* v. *Warren Bridge,* 7 Pick. 447.

Upon the review of the legislation in this state, it is submitted that it affords no support to the doctrine of *Company* v. *Fernald,* but the reverse.

The public act of July 3, 1868, in providing that the court shall add

fifty per cent. to the estimate of damage, impeaches itself.   It is a virtual confession that the property ought not to be taken at all.   If actually taken for public use, there is no more reason why twice its value should be paid for than if taken for a highway.   In the case of property actually and rightly taken for public use, the public cannot justly or constitutionally be required to pay more than a "just compensation ;" but it was found, as soon as attention was drawn to the subject by the introduction of a general flowage act, that no such measure could pass through the legislature, even with the aid of the decision in *Company* v. *Fernald* the year before, without something to render it less obnoxious to the people.   The act is self-condemned.

It undertakes to authorize the taking of land without the owner's consent, for the benefit of a water-mill, by any person or corporation authorized by its charter to do so, and does not in any form or manner secure a public use to the public, upon any terms.   Nor does the common law afford any such security.   It is a taking of property to private uses, to all intents and purposes, beyond the bare fact that the committee are required to find that the flowing or draining is, or may be, of public benefit to the people of this state.   Unless the committee can see that such flowing or draining cannot be useful to the people of this state, they must find it rightful.   The act, in effect, adopts the extreme view of the Massachusetts and Connecticut courts—Chief Justice HINDMAN dissenting—upon which the tribunals that pass upon the rightfulness of the appropriation can only inquire " whether some public interest or benefit may not be likely to accrue from the exercise of the power."   *Talbot* v. *Hudson*, 16 Gray 428 ; *Olmstead* v. *Niles*, 33 Conn. 550 ; *Field* v. *Newton*, 34 Conn. 90.

The legislature of Pennsylvania, acting upon this assumption, that public use means only public benefit or advantage, abolished groundrents, making provision for compensation ; but the court held the act unconstitutional.   They say,—" If this is the kind of public use for which a man's property can be taken, there is practically no limit to the legislative power.   It would result that, whenever the legislature deem it expedient to transfer one man's property to another, upon a valuation, they can effect their object.   What that department of the government considers and pronounces to be the policy of the commonwealth, the judicial department must accept as such."   67 Pa. St. 488.

What answer, we ask, can be given to this argument ?—what possible case can arise, where the court can say that some benefit may not arise to the public from the exercise of that power ?

If the " public use " contemplated by the constitution may consist in the mere benefit that may accrue to the public from the appropriation of property to a particular object, the question whether the use is public is wholly for the legislature.   This necessarily results from the nature of the inquiry, as well as from the provision of the constitution, that the " general court," except as restrained by the constitution, may make all such laws as " they may judge for the benefit and welfare

of the state." The only restriction imposed by the constitution is, that the appropriation shall be to "the public use;" and if "public use" is only public benefit, the legislature is the sole judge of what will be for the public "benefit," and there is no restriction at all. This conclusion is inevitable; and indeed, the court, in *Company* v. *Fernald* (p. 458), says,—"There is nothing in the constitution which limits the general exercise of legislative authority over the subject." The same judge, however, had assumed the opposite of this in the *Petition of the Mt. Washington Road Co.;* and in *Railroad* v. *Greeley* it is expressly laid down that the legislature can only take for public uses, and that what are public uses is a question for the court.

The general grant of authority, quoted by Judge PERLEY, is to ordain "wholesome and reasonable" orders and ordinances; and an act to authorize the taking of property for other than public uses cannot be regarded as either wholesome or reasonable. "An act of the legislature, to have the force of a statute, must be neither repugnant to reason nor to the constitution." *Opinion of the Justices*, 4 N. H. 566.

The constitution, in placing restrictions upon the taking of property for public uses only, by implication prohibits the taking for private purposes upon any terms : otherwise it would be a most absurd instrument. *Railroad* v. *Greeley.* Such an act is not within the domain of legislation : it is not legislation at all, but usurpation and robbery. *Railroad* v. *Greeley*, 17 N. H. 47, 56; *Opinion of the Justices*, 4 N. H. 566; *Petition of Mt. Washington Road Co.*, 35 N. H. 134; *City of Chicago* v. *Baer*, 51 Ill. 311, 313, and authorities *passim.*

There can therefore be no taking, either with or without compensation, for other than public uses : and the question returns, What are public uses? It seems obvious enough, that property taken for a use is taken to be used, and that property taken for a public use is taken to be used by the public. But there can be no pretence that the public use, or acquire the right to use, the property taken under the act of 1868. They do or may use certain useful products of mills and factories, provided they pay the price which the manufacturers set upon them ; and such use of useful products has, by some courts, been deemed sufficient to warrant the taking of private property in aid of a water-power. *Field* v. *Austin*, 34 Conn. 90. But it is precisely the same of the products of a farm. The public have no rights in respect to the mill or factory which they do not have in respect to the farm. They may possibly buy the manufacturer's cloth by paying him his price, just as they may buy the farmer's corn by paying him his price. It is undeniable that if the legislature can annex land to a water-power, without reserving or securing any rights to the public in respect to its use, they can annex it to a farm in the same way. The products of the factory can be no more necessary or useful than those of the farm, for bread is the staff of life. Mills and factories may be highly beneficial to the community, but not otherwise than as all legitimate or useful industry is beneficial to the state.

If the constitution is defective, it is not for the court to depart from

its obvious meaning to supply the defect. It is believed, however, that upon just principles of free government, any change should not be in the direction of more, but less, authority over individual rights. What, then, is the public use permitted by the constitution?

The public use, says Mr. Cooley, "implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies." Cooley's Con. Lim. 531. And this language from Judge Cooley, and the opinion of Mr. Justice WOODBURY, before cited in this brief, are cited with marked approval in the recent very well-considered case of *Whitney* v. *Railroad*, 25 Wis. 167, 182, 194–196.

" The public use [in the case of a railroad] consists in the right of the public to the carriage of persons and property upon tender of the tolls, and the power of the state to control the franchise and limit the tolls." Case last cited.

" The true criterion is, whether the objects, uses, and purposes of the incorporation are for public convenience, or private emolument, and whether the public can participate in them by right, or only by permission." Per BALDWIN, J., 1 Baldwin C. C. R. 223.

It is no answer to say—even if it were true, which it is not—that compensation is sufficiently provided for. If Naboth's vineyard should not have been taken, even for a king, for his private uses, upon any compensation, the rights of the citizen in a constitutional government should be equally well protected. "And whenever his property is sought to be taken under pretence of public necessity or convenience, the owner must find protection in the courts, or our institutions have failed of their great purpose—the complete security of private rights." Per LAWRENCE, J., in *Nevins* v. *City of Peoria*, 41 Ill. 511.

" The entire exemption of private property from being taken for private purposes without the consent of the owner, is a right that should never, under any pretext, be violated or disregarded." *East St. Louis* v. *St. John*, 46 Ill. 464. " The great and essential object of all government is, to secure individuals in the enjoyment of their rights "— *ib.*; and, aside from the invasion of the right of individuals to have their property exempted from being taken for private uses, upon any compensation, without their full consent freely given, is the fact that if it may be taken, as provided by the act of 1868, there is and can be no adequate security that a full compensation can or will be obtained without costing more than it is worth : for what chance does a private individual, with small means, it may be, stand, to obtain justice of a corporation of three millions of capital, disposed to resist and litigate his claims, for the very purpose of deterring others from asserting theirs ? And then, there are to be considered the widely differing views that may be entertained in regard to the extent of the rights of the owner of land flowed. Upon what principle is the owner at the foot of the falls to be deemed the owner of the mill privilege, rather than the owner at the head of the falls ? or, why should the accidental circumstance of priority in the erection of a mill give the person erect-

ing it a right to take, at a valuation, the privilege above it? Yet this may be done, if the act is constitutional.

*S. N. Bell,* for the plaintiffs.

The petition alleges that the construction of the plaintiffs' dam is of public use. That fact is well stated in the petition. The defendant's demurrer admits the truth of the facts stated in the petition, and necessarily admits that the construction of the plaintiffs' dam is of public use.

If there is any dispute whether the use is a public one, that is a question of fact to be tried by the jury; and the statute—Pamphlet Laws, 1868, ch. 20—expressly provides for the trial of this question. Upon a demurrer, no question of the constitutionality of the law can arise upon the point whether the use is public, or that the public have the right to take the defendant's land by payment of the damages.

The points raised by the defendant are all settled in *Ash* v. *Cummings,* 50 N. H. 591.

The present statute is substantially a reënactment of the statute of the province of New Hampshire, passed at the May session, 1718—Province Laws, ed. of 1761 and 1771—which was in force for many years. This act of 1718 was copied from the Massachusetts act of 1713, which, with slight changes, has continued in force to the present time, and has been often decided, both in Massachusetts and Maine, not to be in conflict with the constitutions of those states, whose provisions are substantially the same as the constitution of New Hampshire.

LADD, J. It seems to me the position of the plaintiffs, that the constitutionality of the flowage act of 1868 cannot be raised upon the demurrer, is not tenable.

It is true, the petition states that the construction of the dam is of public use; but it also states specifically, as it should, what that use is, viz., to render the water-power of Merrimack river at the Amoskeag falls available for the use of mills and works situated below, erected and to be erected for various manufacturing purposes set out in the petition.

The fact being thus before the court, I take it to be a question of law whether the use is of such a character as to come within the true interpretation of article 12 of the bill of rights, and the statute under which the right to flow is claimed. In this view, the allegation in the petition that the use is public is immaterial, being an inference or conclusion of law, and is not therefore admitted by the demurrer.

The facts, which are well stated in the petition, and so admitted by the demurrer, undoubtedly show a strong case of a public use, provided the term "public use" in the constitution is to receive an interpretation sufficiently broad to cover a taking of private property in any case for the improvement of a water-power to be employed by private persons for manufacturing purposes. The interests involved are very

large, and the public benefits and advantages which arise from manufactures, by stimulating the growth of towns and cities and thus adding to the material prosperity of the state, are not to be denied.

So far as I can see, the real question presented for our consideration here is identical with that decided in *Company* v. *Fernald*, 47 N. H. 444; and the position of the defendant cannot be sustained without directly overruling that case. I fully appreciate the argument against the conclusion reached by the court in that case. That argument is very clearly and forcibly stated by Mr. Carpenter, in his brief in *Ash* v. *Cummings*, 50 N. H. 592, as well as by the defendant's counsel in the present case;—see, also, Cooley's Const. Lim. 534 *et seq.*, notes and cases cited, Sedgw. on Stat. and Const. Law (2d ed.) 451, *Tyler* v. *Beecher*, 44 Vt. 648;—and if the question could properly be regarded as an open one, I am not now prepared to say what my conclusion would be upon it. But I think it is not now to be regarded as an open question in this state. It was raised, and vigorously and ably argued by counsel, with respect to this very law, in *Ash* v. *Cummings, supra;* and, although it may not be said in the opinion, in so many words, that the doctrine of *Company* v. *Fernald* was sustained and applied, the court could hardly have taken so much pains to give a construction to the law which would bring it within the constitution, as to the matter of compensation to the land-owner, if it had been supposed that the law was fatally defective by reason of its conflict with the constitution in this more vital point.

The whole scope of the opinion in that case, and especially the suggestions as to granting an injunction under certain circumstances,—pages 620, 621,—show that the court went upon the ground that, when proper security as to compensation was furnished, the mill-owner might proceed under the act; and this clearly implies that there might be a taking for a use not public, in the strict sense contended for by the defendant,—as for a fort, a school-house, or a highway,—but for a use public in the broader sense—of utility, advantage. Upon the authority of these two cases, and without discussing the arguments upon one side and the other of the important question, which I think is fairly raised in the present case, I am inclined to hold that this demurrer must be overruled.

CUSHING, C. J. It does not appear to me that this case calls for any extended discussion. The case of *Company* v. *Fernald*, I think, establishes that by our law the use for which the petitioners wish to take the right to flow the defendant's land is a public use, so as that the power of eminent domain applies to it. The case of *Ash* v. *Cummings*, I think, also recognizes the same principle. It is true, that the doctrine of the courts in Massachusetts, as ably expounded by WELLS, J., in *Lowell* v. *Boston*, 111 Mass. 454, while sustaining the right, puts it upon a different ground, and denies that the use is public so as to bring it under the operation of the power of eminent domain.

The doctrine in each of these states, that flowage laws, as they are

called, may be constitutional, seems to be now too well established to leave it open to question. Either way, the law I think must now be held constitutional in New Hampshire, and the demurrer must be overruled.

\* RAND, J., C. C. I do not propose to enter into a discussion of the important doctrines involved in this case. In my opinion, the cases of *Ash* v. *Cummings*, 50 N. H. 591, and *Company* v. *Fernald*, 47 N. H. 444, settle the question of the constitutionality of the flowage act, approved July 3, 1868, if construed in accordance with the doctrine of *Ash* v. *Cummings*.

*The demurrer must be overruled.*